UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CERTAIN UNDERWRITERS AT
LLOYDS subscribing to Policy No.
M3411474 and Policy No. M5061026,

        Plaintiff/Counter-Defendant,

v.                          CASE No. 8:11-CV-63-T-TGW

NOA MARINE, INC.,

        Defendant, and

TU TU MUCH, LLC, and
WILLIAM MAHAFFEY,

        Defendants/Counter-Plaintiffs.

_____

## O R D E R

In this insurance coverage dispute, Certain Underwriters at Lloyd's, Subscribing to Policy No. M3411474 and Policy No. M5061026, the plaintiff/counter-defendant and defendant NOA Marine, Inc.'s insurer ("the plaintiff"), seeks a determination as to what portion, if any, of an underlying arbitration award in favor of defendants/counter-plaintiffs Tu Tu Much, LLC and William Mahaffey (collectively "the defendants") is covered by NOA's

insurance policies.   The evidence at a non-jury trial established that the arbitration award categories of paint, electrical, and flybridge hatch and seating fall within the scope of coverage provided by NOA's policies. Accordingly, judgment will be entered for the defendants in the principal amount of $72,303.93, with prejudgment interest at the rate of 6% per annum, from January 13, 2013.

I.

Tu Tu Much, LLC, is the owner of the M/V Tu Tu Much, a stretched 63-foot, 1988 Viking-Gulfstar yacht ("the vessel") (Doc. 1, ¶10; Doc. 40, ¶9C; Doc. 85, p. 152).  Mahaffey is Tu Tu Much, LLC,'s principal (Doc. 40, ¶9C; see Doc. 85, p. 152).

On July 11, 2005, Mahaffey, on behalf of Tu Tu Much, LLC, entered into a Service/Storage Contract with NOA, a ship repairer, "to perform a comprehensive refit on the vessel" (Doc. 1, ¶¶8, 10; Doc. 7-1, pp. 1, 4-5).  The refit included interior work; installation of a bow thruster, a generator, and hull stabilizers; preparation and painting of the hull and

superstructure; hull work; electrical work; and several other repair items (Doc. 7-1, p. 1; see Doc. 85, pp. 116-17).

NOA worked on the vessel at its premises between July 2005 and April 2007 (Doc. 1, ¶10). During this time, NOA had two Marine General Liability policies with the plaintiff (id., ¶9; Doc. 1-1; Doc. 1-2). The initial policy, Policy No. M3411474, provided coverage for the period from March 29, 2005, through and including March 28, 2006, and the renewal policy, Policy No. M5061026, was effective from March 29, 2006, through and including March 28, 2007 (Doc. 1, ¶9).

Mahaffey retained Henry Pickersgill, a certified marine surveyor and registered marine engineer, to conduct progress inspections on the vessel's refit (Doc. 85, pp. 113, 114-15). Pickersgill visited the vessel approximately once a month beginning in early 2006 (id., p. 115). When "strategic completion point[s]" of the refit were reached by NOA, Pickersgill would inspect the vessel at NOA's premises, review NOA's work orders, and prepare progress reports for Mahaffey describing the status and caliber of the work completed by NOA (id., p. 117).

In an October 2006 report, Pickersgill estimated that the refit of the vessel was 90% complete "both in terms of work order completion and financial investment" (id., p. 149). He further stated (id., pp. 149-50):

> It is the opinion of the below-signed marine surveyor that workmanship and materials involved in all areas of refit and restoration on this vessel were of the highest possible quality available. It is surely going to be somewhat of a standing amusement for owners on being constantly congratulated on their "new boat" for certainly Tu Tu Much has been returned to nearly new condition.

A sea trial of the vessel was conducted in early March 2007 (id., p. 126). About this time, Mahaffey asked Hershel Franklin Griffith, the vessel's captain, to help Mahaffey "bring the boat around from the west coast to the east coast of Florida" (Doc. 86, pp. 122-23). Griffith worked with NOA from March 12, 2007, through April 6, 2007, to prepare the vessel for departure (id., pp. 124-25, 132-33).

In April 2007, a dispute arose between Mahaffey and NOA regarding the quality of NOA's work (Doc. 1, ¶10; Doc. 40, ¶9E). Subsequently, on April 6, 2007, Mahaffey, with the help of Griffith and

captain Chris Nokomis, departed NOA with the vessel and headed for Merritt Boat and Engine Works, Inc. ("Merritt"), a marine repair facility in Fort Lauderdale, Florida (Doc. 85, pp. 161-62; Doc. 86, p. 132).

The vessel arrived at Merritt on April 24, 2007 (Joint Exhibit ("JE") 14, ¶7). Shortly thereafter, Merritt commenced work on a list of over forty items that Mahaffey wanted inspected and repaired (id., ¶¶7, 9). Additional repairs were performed by Ward's Marine Electric, Yacht Equipment and Parts, and Edd Helms Marine Air Conditioning & Refrigeration, among others (JE 4A-D, 5A-B, 6, 10; Defendant's Exhibits ("DE") 27, 28). After the vessel left Merritt, repairs were completed by Winter Harbor, LLC, in New York (JE 11A-J).

Seeking damages for unpaid invoices in the amount of $27,095.58, NOA initiated an arbitration proceeding (NOA Marine, Inc. v. William Mahaffey, M/V Tu Tu Much) pursuant to the arbitration clause of the Service/Storage Contract (Doc. 40, ¶9E; see Doc. 7-1, p. 5, ¶IV). In their response to NOA's Statement of Claim, the defendants denied NOA's claim for damages, and sought judgment in excess of $400,000 for NOA's alleged

breach of the Services/Storage Contract (Doc. 7-1, pp. 1-3). Specifically, the

defendants asserted (id., p. 2):

> NOA Marine breached the Services/Storage
> Contract when it failed to repair the vessel in a
> workmanlike and acceptable manner. NOA Marine
> further breached said contract by failing to
> complete the work that Respondent bargained for
> and that NOA Marine promised. In addition to
> breaching the contract, NOA Marine impliedly
> warranted that the repairs to the vessel would be
> conducted in a workmanlike manner. Contrary to
> and in breach of the agreement between the parties,
> and in breach of warranty, NOA Marine failed to
> repair TU TU MUCH as promised.

Attached to the response was a "list of repair items resulting from NOA

Marine's breach of contract and warranty" (id., pp. 2, 6-12). On May 22,

2008, the plaintiff agreed to defend NOA against the counterclaim, subject to

a reservation of rights (Doc. 1, ¶11; Doc. 1-3).

After "nearly 5 full days of testimony, two in January 2008 and

three in April 2009," and the introduction of "several depositions and

affidavits ... as well as hundreds of pages of documents and photographs" into

evidence, the arbitrator issued an Arbitration Award on July 28, 2009 (Doc.

7-2, p. 1). The arbitrator awarded NOA's claimed amount for unpaid

invoices, $27,095.58, in full (id., pp. 2, 5). With respect to the counterclaim,

the arbitrator awarded $140,221.18 to the defendants, including $25,000.00

for paint, $49,466.82 for stabilizers, $35,447.93 for electrical, $11,856.00 for

flybridge hatch and seating, $4,035.00 for interior carpentry, $8,683.43 for

miscellaneous carpentry, and $5,732.00 for the flybridge windshield (id., pp.

2-5).[1]

Subsequently, on October 13, 2009, the arbitrator entered an

Order on Post-Award Relief, awarding $3,133.64 in interest to NOA and

$18,892.01 in costs and $6,232.68 in interest to the defendants (Doc. 1-4, pp.

5-7). After setoff of NOA's award, the net total arbitration award for the

defendants was $135,116.65 (id., p. 7).

Pursuant to the arbitration award, suit was brought in Pinellas

County Circuit Court, Case No. 09-020461-C1, William Mahaffey and Tu Tu

Much, LLC v. NOA Marine, Inc. (Doc. 1, ¶13). In an Order on Motion for

Default Judgment dated July 15, 2010, the court confirmed both arbitration

orders (Doc. 1-5). Additionally, the court entered a default judgment against

---

[1]The arbitration award also addressed claims regarding bow thrusters and rudders
(Doc. 7-2, p. 3). However, these items are not at issue in this case.

NOA in the principal amount of $135,116.65 plus post-arbitration interest of $6,116.98, for a total of $141,232.63 with an interest rate of 6% per annum (id.). An Amended Final Judgment was entered on January 11, 2013, in the amount of $162,382.70, bearing interest at a rate of 6% per year (JE 2B, p. 2).

The plaintiff commenced this action in January 2011, seeking declaratory relief against NOA and the defendants (Doc. 1). The plaintiff alleged that most of the defendants' claim against NOA is for faulty workmanship, and that the policies "[s]pecifically excluded ... faulty workmanship as set forth in Exclusion (vi)" of the Ship Repairer's Legal Liability Endorsement ("the Endorsement") (id., ¶¶16, 17). The plaintiff further alleged that, "at the most," the amount of coverage provided under the policies is $30,000.00 (id., ¶19).

In their response to the complaint, the defendants denied the applicability of Exclusion (vi) and asserted that the compensatory damages awarded to them in the arbitration are covered by Sections (i), (iv), (vii), and (viii) of the Endorsement's "Insuring Agreement" (Doc. 7). The defendants

also counterclaimed, alleging that paragraphs (i)-(ix) of the Endorsement provide coverage for the full amount of the judgment (id., pp. 5-9).

NOA failed to make an appearance in this case, and it did not plead or otherwise defend the complaint. Accordingly, default was entered against NOA on June 12, 2012 (Doc. 57).

Each of the insurance policies at issue includes a Marine General Liability Policy ("MGL") and an Endorsement (Docs. 1-1, 1-2). The MGL has three parts: Part I is the insuring agreement, which provides, among other things, property damage coverage, and is subject to the other two parts of the policy; Part II sets forth exclusions; and Part III states general conditions and definitions. As pertinent here, the two policies are identical (see Doc. 50-1, p. 4; Doc. 92, p. 5).

On January 6, 2012, the defendants filed a motion for summary judgment, requesting the entry of summary judgment on all claims asserted by the plaintiff in this action (Doc. 27). In the Order denying the motion, United States District Judge Elizabeth A. Kovachevich stated that the insurance policies issued by the plaintiff are "occurrence" policies, which

covered in pertinent part, "liability for ... property damage caused by an 'occurrence' which takes place during the policy period" (Doc. 50-1, p. 7). Judge Kovachevich concluded that the plain meaning of the phrase "damage to" as used in the Endorsement is "property damage to," and material factual disputes existed as to whether the arbitration award was for items of property damage that occurred while the vessel was in the care, custody or control of NOA (id., p. 15).

The parties consented in this case to the exercise of jurisdiction by a United States Magistrate Judge in June 2012 (Doc. 63). Thereafter, with permission from the court, the defendants filed a second motion for summary judgment, which was limited to the applicability of Section (vii) of the Endorsement (Doc. 69). Because Section (vii) was raised in the defendants' first motion for summary judgment and considered in the ruling on that motion, the second motion for summary judgment was denied (Doc. 73).

A two-day, non-jury trial was held before me in January 2013. At the close of the trial, I directed the parties to submit post-trial memoranda. Those papers have been filed (Docs. 91, 92).

## II.

At issue in this lawsuit is the extent to which the subject policies cover the arbitration award in favor of the defendants. Specifically, the parties seek a determination as to the plaintiff's liability to indemnify NOA with respect to seven categories of the arbitration award: paint, stabilizers, electrical, flybridge hatch and seating, interior carpentry, miscellaneous carpentry, and flybridge windshield.

As the parties have correctly pointed out (Doc. 91, p. 20; Doc. 92, p. 6), the insured party has the burden of proving that a claim is covered by the insurance policy. LaFarge Corp. v. Travelers Indemnity Co., 118 F.3d 1511, 1516 (11th Cir. 1997). The insurer, on the other hand, bears the burden of proving that an exclusion prevents coverage. Id.

The defendants contend that "Section (vii) of the Endorsement's 'Insuring Agreement' provides coverage for all compensatory damages resulting from NOA's work as a ship repairer wherever it occurs" (Doc. 92, p. 3). Thus, in the defendants' view, the entire arbitration award is covered by Section (vii). Alternatively, if Section (vii) does not provide coverage for

all claims, the defendants assert that the disputed categories of the arbitration award constitute property damage pursuant to Sections (i) and (iv) (id.). In all events, according to the defendants, none of the claimed damages are excluded from coverage because there is no evidence that any part for which damages are claimed was condemned or rejected (id.).

Although it concedes that a portion of the electrical award is covered under the policy, the plaintiff argues that the remainder of the defendants' claims pertain to warranty work rather than property damage and, therefore, is outside of the policy's scope (Doc. 91).[2]

A. The defendants allege that "[u]nder the clear terms of section (vii)," all compensatory claims awarded to them in the arbitration are covered by NOA's policies (Doc. 92, p. 8). In this connection, the defendants argue (id.):

> The provision does not limit the compensatory
> damages to the "loss of or damage to" any vessel or
> equipment. It does not limit the area in which the
> liability arose. It covers all compensatory damages

---

[2]The plaintiff's post-trial submission also mentions Exclusion (i) (Doc. 91, p. 7). However, the plaintiff failed to develop any argument regarding this provision's application at trial or in its post-trial submission. Consequently, any such argument about Exclusion (i) is deemed abandoned.

arising wherever the vessel is located, either in port or at sea.  There is simply no limitation in this provision of the Endorsement other than the requirement that the work giving rise to the compensatory damages be performed by or on behalf of the named insured on the vessel for the purpose of effecting repairs.

Section (vii) provides coverage for (Doc. 1-1, p. 34; Doc. 1-2, p. 28) (emphasis in original):

> work performed by persons employed by or on behalf of the **Named Insured** whenever such persons are aboard the vessel and/or drilling rig at sea or in any port for the purpose of effecting repairs and/or other work entrusted to the **Named Insured** notwithstanding that such persons may be signed on as members of the vessel's crew....

Thus, only work that is performed by NOA's employees or persons acting on behalf of NOA while "aboard the vessel ... at sea or in any port" is covered by Section (vii).  A "port" is "[a] harbor where ships load and unload cargo" or "[a]ny place where persons and cargo are allowed to enter a country and where customs officials are stationed." BLACK'S LAW DICTIONARY 1199 (8th ed. 2004).

Here, the vessel was neither "at sea" nor "in any port" while undergoing repairs at NOA.  Rather, as the plaintiff pointed out in its response to the defendants' second motion for summary judgment, "the Vessel was hauled and put on blocks in a large shed on NOA's property ... where it remained for some 20 months, until sea trials in early March, 2007. The Vessel remained on dry land and completely out of navigation during those 20 months" to undergo a comprehensive refit (Doc. 71, p. 8). Consequently, Section (vii) does not provide coverage for alleged damage arising from the work performed at NOA's premises.

In addition, to the extent that the defendants argue that Section (vii) is not limited to "loss of or damage to" the vessel or its equipment while in the "care, custody or control" of NOA, this interpretation is unreasonable. Thus, in Florida, "an insurance policy should be construed in its entirety and given the construction which reflects the intent of the parties." Gulf Tampa Drydock Co. v. Great Atlantic Insurance Co., 757 F.2d 1172, 1174 (11th Cir. 1985). Reading the policy and the Endorsement in their entirety, it is simply

not reasonable to conclude that the parties meant Section (vii) to provide unlimited coverage for all work performed by, or on behalf of, NOA.

In the first place, the insurers would not plausibly bury such a generous grant of coverage as the seventh among a list of nine. More significantly, such a grant would render superfluous the first four items on the list. Those grants of coverage limit the insurer's obligation to property damage. Thus, they cover damage to any vessel in the care of the insured; to any other vessel the insured is working on; to any cargo discharged from those vessels; or to machinery or equipment of a vessel in the insured's care (Doc. 1-1, p. 34; Doc. 1-2, p. 28). As Judge Kovachevich concluded in her summary judgment Order, these provisions insure against property damage to the vessel or its equipment (Doc. 50-1, p. 15; see p. 18). See Gulf Tampa Drydock Co. v. Great Atlantic Insurance Co., supra, 757 F.2d at 1175 ("Nowhere in the policy is coverage provided for the success or failure of the assured's repair work. This is not a 'products liability' or 'completed operations' policy. If the assured does unsatisfactory work on the vessel, but does not damage the vessel while working on it (or while the vessel is in its custody for such work),

it is not covered against liability to its dissatisfied customer."). If, as the defendants contend, Section (vii) covers all work performed by persons on behalf of the insured for the purpose of effecting repairs or other work, these four provisions would be meaningless.

In addition, it would make a nullity of Exclusion (vi). That provision does not cover liability (Doc. 1-1, p. 35; Doc. 1-2, p. 29):

> in respect of or arising from or in connection with condemnation or rejection of any part by reason of faulty design or faulty workmanship, including the cost or expense of repairing, modifying or replacing any part (or for any loss or expense arising therefrom) by reason of faulty design or faulty workmanship....

Therefore, if Section (vii) covers all repairs by or on behalf of the insured, it would seemingly override Exclusion (vi) and deprive it of any significance.

Consequently, when the policies are construed as a whole, Section (vii) cannot reasonably be given the interpretation the defendants ascribed to it.

Moreover, contrary to the defendants' position (Doc. 92, p. 10), it appears that Section (vii) is in fact a traveling workmen's clause. See

<u>Folksamerica Reinsurance Co.</u> v. <u>Clean Water of New York, Inc.</u>, 413 F.3d 307, 323 (2nd Cir. 2005); <u>see also</u> Attachment 1, p. 3. Section (vii) provides coverage while NOA's employees work on the vessel at sea or in any port, "notwithstanding that [the employees] may be signed on as members of the vessel's crew." Thus, Section (vii) extends coverage to work done on behalf of the insured even when the work is performed by a person who is signed on the vessel as a member of the crew.

As a traveling workmen's clause, Section (vii) merely extends the coverage of the Endorsement's "Insuring Agreement." No provision in the Endorsement, including Sections (i) and (iv), provides coverage for warranty work. Therefore, coverage only exists under Section (vii) if NOA's work caused property damage to the vessel. <u>See Gulf Tampa Drydock Co.</u> v. <u>Great Atlantic Insurance Co.</u>, <u>supra</u>.

The defendants argue that a finding that Section (vii) is a traveling workmen's clause renders the provision ambiguous (Doc. 92, p. 11). Ambiguous terms in a contract are to be construed against the insurer. <u>Gulf Tampa Drydock Co.</u> v. <u>Great Atlantic Insurance Co.</u>, <u>supra</u>, 757 F.2d at 1174.

"However, ambiguity exists in an insurance policy only when its terms make the contract susceptible to different <u>reasonable</u> interpretations, one resulting in coverage and one resulting in exclusion." <u>Id</u>. at 1174-75 (emphasis added).

Contrary to their assertion, the defendants' all encompassing interpretation of Section (vii) is unreasonable and inconsistent with the plain language of the policy. Accordingly, the defendants' interpretation must be rejected. Consequently, Section (vii) does not extend coverage to the defendants' claims in this case.

B. Absent a finding of coverage pursuant to Section (vii), the defendants assert that the disputed portions of the arbitration award constitute property damage within the scope of Sections (i) and (iv) of the Endorsement (Doc. 92, pp. 11-12). These sections provide coverage for (Doc. 1-1, p. 34; Doc. 1-2, p. 28) (emphasis in original):

> (i) loss of or damage to any vessel or craft which is in the care, custody or control of the **Named Insured** for the purpose of being worked upon, including shifting and moving within the limits of the port where the work is being done and including trial trips not exceeding 100 miles from such port;
>
> ...

> (iv) loss of or damage to machinery or equipment of any vessel or craft which is in the care, custody or control of the **Named Insured** for the purpose of being worked upon, including while in transit between such vessel or craft and the premises of the **Named Insured** or whilst in transit to or from specialist repairers or manufacturers' premises....

As indicated, Judge Kovachevich, in her Order denying the defendants' first motion for summary judgment, found that the plain meaning of "damage to" in Sections (i) and (iv) is "property damage to" the vessel or its machinery or equipment while "in the care, custody or control" of NOA (Doc. 50-1, p. 15).

The Florida Supreme Court has "recognized that there is a difference between a claim for the costs of repairing or removing defective work, which is not a claim for 'property damage,' and a claim for the costs of repairing damage caused by the defective work, which is a claim for 'property damage.'" United States Fire Insurance Co. v. J.S.U.B., Inc., 979 So.2d 871, 889 (Fla. 2007). Further, the use of a defective part is not property damage unless that defective part causes "physical injury to some other tangible property." Auto-Owners Insurance Co. v. Pozzi Window Co., 984 So.2d 1241, 1248 (Fla. 2008). Thus, a claim for the repair or replacement of a part

that was defective prior to installation and as installed is not "property damage." Id. On the other hand, "if the claim is for the repair or replacement of [parts] that were not initially defective but were damaged by the defective installation, then there is physical injury to tangible property." Id. at 1249.

At the beginning of the trial, the parties acknowledged that these principles are appropriately applied here if, as is the case, Section (vii) does not provide coverage. Thus, counsel for the plaintiff stated that "the only thing covered by the policy is damage to the vessel itself. It's not a warranty policy. It's not the redo of work...." (Doc. 85, p. 5). Counsel for the defendants, in turn, relied primarily upon Section (vii), but argued alternatively that the repairs did damage to the vessel (see, e.g., id., pp. 13, 15; see also p. 19).

The problem in this case is that these principles did not apply to the arbitrator's award in this case. Thus, he did not limit his award to items involving property damage to the vessel or equipment. Accordingly, the defendants cannot recover under Sections (i) and (iv) each of the items simply because the arbitrator awarded them to NOA.

To the extent that any awarded item includes both damage to the vessel or equipment, and defective work that needed to be done over, the defendants, as claimants of money damages, have the burden to establish the amount that is attributable to property damage. "It has long been accepted in Florida that a party claiming economic losses must produce evidence justifying a definite amount." United Automobile Insurance Co. v. Colon, 990 So.2d 1246, 1248 (Fla. App. 2008). Consequently, as to any category involving both property damage and defective work, the defendants' claim will fail unless they can establish a non-speculative definite amount of property damage. Travelers Indemnity Co. v. Peacock Construction Co., 423 F.2d 1153, 1157 (5th Cir. 1970).

1. Paint. As part of the refit, Mahaffey requested that NOA repaint the vessel using Awlgrip paint (Doc. 85, pp. 116, 158). Because it is "physically impossible" to paint a 63-foot boat at one time, the vessel was painted in sections (see Doc. 86, pp. 157, 167-68, 181). NOA completed this work around August 2006 (Doc. 85, p. 159). Thereafter, NOA stored the vessel in a shed, where no painting occurred (id., pp. 111-12).

Pickersgill's initial assessment of the of the paint job was "fairly good"; he testified that "[t]he gloss was good, it was smooth, didn't seem to be a lot of overspray or lap spray" (id., pp. 117-18). However, in March 2007, Griffith observed swirl marks, paint stags, unfilled screw holes that had been painted, oversprayed stanchions, painted over fuel caps, and unfinished caulk joints that had been painted (Doc. 86, p. 130). Pickersgill confirmed the paint issues in his April 6, 2007, report to Mahaffey, noting that the Awlgrip paint "had been damaged 'in one way or another'" (Doc. 85, p. 131).

NOA attempted to correct imperfections and overspray in the vessel's paint with sanding and buffing. In this connection, Scott Bates, an NOA employee, testified that he sanded overspray while the vessel was initially being painted (Doc. 86, pp. 7, 37). In addition, Bates sanded and buffed the flybridge area of the vessel in November 2006 (id., p. 175). According to Richard Watkins, NOA's manager, NOA buffed the vessel again in March 2007, when Griffith noticed what appeared to be dust in the paint below the flybridge (id., pp. 151, 166-67).

During a conversation with Mahaffey about the paint job, Watkins offered to repaint "the forward section above those forward three windows because of the buffing areas" and "the overhead area in the aft cockpit because of screw holes we had left there because we thought snaps were going back in its place" (id., p. 180; see id., p. 167). Mahaffey, however, did not want the vessel spot painted (id., p. 167).

The arbitrator found that the vessel's paint was damaged and required repair. In this regard, the arbitrator explained (Doc. 7-2, p. 2):

> The evidence established that the new paint applied by NOA was damaged by over spray and buffing while the vessel was at NOA and that these conditions required repair. The evidence also establishes that NOA did not properly fill and prepare holes for painting where it removed hardware prior to repainting. However, Respondent[] claims that the entire vessel required repainting. The estimates for such repainting are deemed to be excessive. Considering the NOA charges for painting the portions of the vessel pursuant to its contract and the estimate for repainting the entire vessel, it is determined that the reasonable cost of repainting the portions of the vessel necessitated by NOA's deficiencies is $25,000. This amount is awarded to Respondent.

Case 8:11-cv-00063-TGW   Document 95   Filed 04/22/13   Page 24 of 43 PageID 1516

The defendants contend that the overspray itself, as well as NOA's attempts to repair the overspray with buffing, damaged the vessel's already completed paint job (Doc. 92, pp. 16-18). At trial, Pickersgill opined that the overspray and attempted repair satisfied the policy's definition of property damage, and he pointed out that the Awlgrip manual states "'do not buff, do not sand'" and "'[d]o not use abrasives, scratch pads or polishing compounds'" (Doc. 85, pp. 122-23, 124-25).

The plaintiff, however, asserts that the paint problems are merely cosmetic issues, and are therefore warranty repairs rather than property damage (Doc. 91, p. 10). The plaintiff's expert, yacht designer and sailor Johanes J. Helsen, did not believe the vessel was damaged by buffing (Doc. 85, pp. 25-27, 82). Thus, Helsen testified that "[t]he only way you can eliminate [overlapping overspray] is with sanding and buffing. Dupont and ... Awl Grip actually teach you how to do that" (id., p. 42).

The plaintiff further responds that buffing and overspray are the "norm" when a vessel is painted in sections, and, because there were no other boats painted in the shed where NOA stored the vessel, "the overspray and

-24-

buffing [were] solely part of painting the [vessel]" (Doc. 91, pp. 9-10). In this connection, Helsen testified that overspray is "very common," and he has never personally experienced a paint job that did not have overspray (Doc. 85, pp. 40, 42). However, on cross-examination, Helsen conceded that the overspray constitutes damage (id., p. 82).

In sum, there was conflicting evidence whether the painting constituted property damage or warranty work. However, the parties are in agreement that the point of the trial was not to re-determine the matters resolved by the arbitrator, but to decide what portions of the arbitrator's award is covered by the insurance policies (see Doc. 85, pp. 7-8; Doc. 92, p. 15).

The arbitrator found that "the new paint applied by NOA was damaged by over spray and buffing while the vessel was at NOA and that these conditions required repair" (Doc. 7-2, p. 2) (emphasis added). Moreover, the arbitrator expressly declined to award amounts for the repainting of the entire vessel, which would be in the nature of warranty work. These circumstances indicate that the arbitrator was awarding the sum of

$25,000.00 to repair damage to the vessel. In other words, it compensated for property damages and thus is covered by the policy.

2. Stabilizers. The refit also included the installation of new WESMAR stabilizers, which had been purchased by Mahaffey (Doc. 85, p. 116). The vessel previously had no stabilizers, and NOA had to cut holes into the vessel's hull and then strengthen and prepare the hull for the installation of the stabilizers and mounting block (id.; Doc. 86, pp. 50-51). As part of this process, NOA used "superboard" as a core replacement instead of epoxy resin, which is recommended by the WESMAR manual (Doc. 85, pp. 48, 143).

With respect to this item, the arbitrator stated (Doc. 7-2, p. 3):

> The evidence supports Respondent's claim on this item in the amount of $49,466.82. Contrary to NOA's assertions that the stabilizers were damaged by impact between Ft. Lauderdale and New York, there is ample evidence to show that the stabilizers were stuck in a severe toe in position, the stabilizer blocks were not properly bedded, the hull blocks were not properly fiberglassed to the hull, the potentiometers were not properly wired and the gyrocompass was installed backwards while the vessel arrived in Ft. Lauderdale, although some of the repairs were not accomplished until the vessel reached [N]ew York.

Unlike the claim for painting, it cannot be determined whether this award was for damage to the vessel or equipment, for repairs of defective workmanship, or for a combination of both.  Moreover, a review of the evidence does not establish that the award was solely for property damage.

During the sea trial in March 2007, Dale Single, an NOA electrician, set the potentiometers while the stabilizers were locked into place and checked for leaks (Doc. 86, pp. 44, 58-60).  However, Single did not believe that the stabilizers were operationally tested at this point (id., p. 59). In a post-sea-trial report dated March 15, 2007, Pickersgill noted that the "steering control was good," and "[t]he stabilizers were powered up for 'neutral' calibration.  This system is to be completed and tested for full operation" (DE 47, p. 2).

As indicated, the vessel traveled approximately 500 miles from NOA to Merritt in April 2007. Mahaffey and Griffith both stated that they had trouble steering the vessel during this trip, noting that the vessel's furniture, appliances, and flybridge seating came loose and moved around when the

vessel encountered broaching conditions (Doc. 85, pp. 162-64; Doc. 86, pp. 137-40).

Griffith said that the stabilizers appeared to be working at first because a light on the vessel showed that they were operational (Doc. 86, pp. 144-45).  However, at trial, Mahaffey explained (Doc. 85, p. 163):

> And I think we finally came to the conclusion that we had to turn off the stabilizers.  We were trying to get it to stabilize.  We had to turn them off and – but we didn't catch that for a while.  You could see them working, but you couldn't find out what the problem was, but we did find that out.

In May 2007, Mahaffey contacted Eric Sponberg, a naval architect and owner of Sponberg Yacht Design, Inc., about the problems with the vessel's steering (Doc. 86, pp. 78, 81-82).  Following his inspection of the vessel at Merritt, Sponberg opined that NOA did not properly install the stabilizers (DE 41, p. 1).  He summarized his findings as follows (id.):

> The Wesmar stabilizer blades are 5.5 sq. ft. planform area on each blade and located approximately mid-body on the hull.  They were found locked or stuck in a severe toe-in position.  Measurements revealed that they are each toed in approximately 20-22° nose inboard (see photos).  This is quite improper.  The blades should be at

least parallel to the vessel centerline, and if there is any toe-in at all, it should only be a few degrees inboard, certainly not 20-22°. This is most likely the primary cause of the poor steering. Being aerofoil sections and toed in so much, the blades will generate considerable lift which interferes greatly with the control of the yacht. The stabilizers are a new installation to the yacht that was not completely finished at NOA Marine, and so they have never been properly set up. I understand that you [Mahaffey] have arranged for Wesmar authorized technicians to come to the yacht, review the installation and set-up, and make any necessary corrections. This will most likely solve the steering problems.

Accordingly, Sponberg recommended that a WESMAR technician inspect all of the stabilizer hardware and software to check for proper installation and operation (id., p. 3).

In April or May 2007, Mark Hanke, general manager of Merritt, contacted Yacht Equipment and Parts ("YEP") to inspect and repair the stabilizers (DE 27, ¶¶4, 6). While visiting the vessel, YEP technician Pierre Deforges found the fins were opposing each other; the seals were in good shape and the fin stabilizers were on the correct spline; the hull blocks were not properly fastened or fiberglassed to the hull; the potentiometers and values

were incorrectly wired; the gyro compass was installed backwards; and the circuit breaker connected to the stabilizers was overloaded (id., ¶¶6, 7; DE 28, ¶¶5, 6, 7, 8). Therefore, Deforges reinstalled the gyro compass, rewired the potentiometers and valves on the circuit board and at the fin location, removed extra loads from the circuit breaker which was connected to the stabilizers, calibrated the fins, and performed dockside tests (DE 28, ¶¶7, 8, 9). Due to time constraints, Mahaffey did not allow YEP to conduct a sea trial (JE 10, pp. 2, 3; see DE 28, ¶10).

Merritt also worked on the stabilizers. According to Hanke, Merritt found that the stabilizers had "movement and some leakage" (JE 14, ¶9(f)). In his affidavit, Hanke stated that most stabilizer manufacturers require the block assembly to be fiberglassed to the hull to ensure that the structure is strengthened at the block and stabilizer contact points (id.). "In order for Mr. Mahaffey to continue his trip north [Merritt] basically injected 5200 sealant in a temporary attempt to reduce the water intrusion. This was only temporary and no guarantees were made following this repair" (id.).

After leaving Merritt, Mahaffey took the vessel to Winter Harbor in New York.  Around this time, Mahaffey contacted Wayne Robinson, a marine surveyor, to "determine if there was moisture in the hull, to what extent and what areas, [and] to determine if there was a relationship to the starboard stabilizer" (Doc. 86, pp. 100, 102).  The first time Robinson saw the starboard stabilizer, it was jammed into the side of the vessel's hull (id., p. 102).

Robinson performed multiple moisture surveys on the vessel.  His initial survey, in December 2007, revealed low moisture at the port side stabilizer and medium to high moisture at the starboard side stabilizer (DE 50A, p. 1).  Subsequently, in February 2008, Robinson reported (DE 50B, p. 1) (emphasis in original):

> The starboard hull at the opening for the stabilizer bearing is moist and the core material is soft.  The area where the mounting pad joins the hull had degraded caulk and was not sealed well, ***nor was the pad properly fiber glassed to the hull.***  These conditions allowed moisture to penetrate the hull over extended time and eventually led to the stabilizer alignment problem, that being that the shaft wandered off its design centerline when stressed underway, loosening the mounting pad and promoting further moisture penetration.

The following month, additional moisture readings were taken by Robinson and Pickersgill (Doc. 86, pp. 110-11). Although they found slightly high or elevated moisture readings around the stabilizer shaft ports, Robinson explained that the levels had decreased since his initial tests and this indicated that the drying out process had begun (Doc. 85, p. 141; Doc. 86, p. 111). However, Robinson stated that he could not rule out the possibility that these moisture readings came from the vessel's stringers (Doc. 86, p. 116).

The plaintiff asserts that "there is no evidence that NOA was the one who locked and pinned the stabilizers into a toe-in position" (Doc. 91, p. 12). However, the arbitrator seemingly found that the toe-in position of the stabilizers resulted from work performed by NOA.

Nevertheless, the defendants have failed to establish that all of the award of $49,466.82 was due to damage to the vessel or equipment. The improper installation and set-up of the stabilizers would fall into the category of warranty work. It is unclear from the evidence whether the stabilizers themselves were damaged by the improper installation. Moreover, the defendants not only have not demonstrated the extent to which the stabilizers

-32-

were damaged by the improper installation, they have made no attempt to establish the cost of repairs to the stabilizer. Rather, the defendants' position is simply that they are entitled to recover the entire amount awarded by the arbitrator (Doc. 92, pp. 18-19). However, as indicated, it is the defendants' burden to show what portion of that award is property damage. United Automobile Insurance Co. v. Colon, supra, 990 So.2d at 1248; Travelers Indemnity Co. v. Peacock Construction Co., supra, 423 F.2d at 1157. The defendants have clearly failed to carry that burden with respect to the stabilizers.

3. Electrical. While located at NOA, the vessel experienced voltage spikes which damaged, among other things, the vessel's light bulbs, microwave, inverter, refrigerator, and air conditioners (Doc. 85, pp. 93-94, 134-135; Doc. 86, pp. 46-50, 125-28). According to Griffith, "there were surges pretty much the whole time" he was at NOA in March and April 2007 (Doc. 86, p. 128).

NOA sought assistance from Petersen Marine, Inc. ("Petersen") for servicing the vessel's air conditioners and subsequently troubleshooting

-33-

and repairing the electrical problems (JE 8, 12, 13). Griffith indicated that "everything seemed to be in operational condition" after Petersen completed its troubleshooting (Doc. 86, p. 150). However, at some point during the trip to Merritt, the vessel "lost all electronics," including the GPS, depth finder, auto pilot, and 12 volts (id., p. 142).

Following the vessel's arrival in Fort Lauderdale, Ward's Marine Electric ("Ward's") was asked to inspect and repair the vessel's shore power inlets (Doc. 86, pp. 62, 70; see JE 4A-D). William Tedcastle, a marine electrician employed by Ward's, determined that the ring terminals connected to the main shore power breaker were improperly sized and loose (Doc. 86, pp. 67-68, 71). Tedcastle believes that improper crimping or use of the wrong tool caused the loose connections (id., p. 76). According to James Cote, service and engineering manager at Ward's, improper crimping can result in overheating or no electrical connection at all (id., pp. 61, 64).

The arbitrator awarded $35,447.93 for electrical damages (Doc. 7-2, p. 4). In this regard, he explained (id.):

> The evidence supports Respondent's claim on this item but not as to each element of damage claimed.

-34-

In summary form, the evidence on this item is that Cornett, a subcontractor to NOA, attached certain wires to a new S-2 switch furnished by NOA pursuant to its contract. Loose wires were later discovered, which, according to the evidence, probably caused voltage spikes which damaged various components and appliances in the vessel. Cornett testified that he attached and tightened the wires the best he could but was concerned about their integrity because of the excessive movement of the large S-2 switch. He informed NOA of his concerns, and NOA agreed to address the problem. Apparently, NOA secured the switch/wires with zip ties, which Cornett testified would not have been his solution to the problem. The amount awarded to Respondent on electrical is $35,447.93.

The plaintiff concedes that certain damages included in the arbitration award were caused by an electrical spike while the vessel was located at NOA, and that these damages, amounting to $8,891.29, are covered under the policy (Doc. 91, pp. 16-17; see Doc. 85, pp. 68-69, 74). However, the plaintiff argues that the remainder of the electrical award was for optional upgrades to the vessel's electrical system and components rather than property damage (Doc. 91, p. 17). In this respect, the plaintiff's expert, Helsen, testified that several of the invoices for electrical work from Ward's included

notations regarding "upgrades," and that he did not consider upgrades to be property damage or warranty work (Doc. 85, pp. 69-71, 92).

The arbitrator's explanation indicates that he based his award on property damage to the vessel and equipment. Thus, he focused on loose wires to a new S-2 switch which he thought "probably caused voltage spikes which damaged various components and appliances in the vessel" (Doc. 7-2, p. 4). Notably, the arbitrator concluded that the evidence did not support each element of damage claimed. In other words, he rejected some of the claims of damage. Moreover, there is nothing in his explanation that suggests he awarded amounts for upgrades. Under these circumstances, the entire award of $35,447.93 appears to be for property damage to the vessel and equipment and none of it is for warranty work or upgrades. Therefore, the award is recoverable under the policies.

4. <u>Flybridge Hatch and Seating</u>. The flybridge is the upper deck of the vessel and is located above the main living room (Doc. 85, pp. 165-66). The flybridge hatch is a door in the floor of the flybridge which, when opened,

provides access to a staircase leading down to the main living room. The flybridge in this case had built-in furniture (id., p. 166).

The refit work in this category included rebuilding the flybridge hatch, redoing the headliner in the cabin interior, and repairing the flybridge deck drains (Doc. 86, pp. 28-32, 33-34; see Doc. 85, pp. 164-65). NOA painted the flybridge furniture, which required removing the furniture from the flybridge area and subsequently replacing it (Doc. 85, p. 166). In addition, a flybridge cabinet was rebuilt (id.).

The defendants contend that NOA failed to secure the flybridge area, causing the furniture to come loose and move around the flybridge when the vessel encountered broaching conditions during the trip from NOA to Merritt (Doc. 92, pp. 21-22). In this regard, the plaintiff's expert conceded that the repair invoices state that the flybridge area was either "bolted poorly" or "it wasn't fastened at all" (Doc. 85, p. 72).

The defendants further allege that NOA's failure to properly seal the flybridge hatch and fasten the flybridge seat resulted in water damage to the vessel (Doc. 92, pp. 21-22). Thus, Mahaffey testified that substantial

amounts of rain leaked through the hatch and into the main living room while the vessel was at sea (Doc. 85, pp. 164-65; see DE 1-X).  In addition, Pickersgill explained that water was leaking "[o]ver the lower helm station, around the galley.  It wasn't just the hatch and the seat.  The seat being unfastened, the holes [around the hatch] being opened, allowed water to travel down into the boat" (Doc. 85, p. 136).

Invoices from Merritt confirm that water leaks were found throughout the overhead in the dining area and salon (see JE 14, ¶9(m)).  In his affidavit, Hanke stated: "Water testing was conducted before the repairs were performed and all during the repair.  Due to the bridge having been opened up, with no canvas, areas of leakage were noted and sealed.  This was directed and tested on the bridge area only" (id.).  Hanke further noted that water entered the coring of the fiberglass deck due to deck drains not being sealed to the deck (id., ¶9(w)).

The arbitrator, without any explanation, awarded $11,856.00 for the flybridge hatch and seating claim.  Unquestionably, there was property damage to this area.  The plaintiffs, for their part, make no attempt to show

that there was any warranty-type work involved in this claim (Doc. 91, p. 18).
Rather, they simply made the inapposite and unpersuasive argument that
Mahaffey departed before NOA thought he would.   Thus, from all that
appears, the award of $11,856.00 was solely for property damage.
Accordingly, the defendants are entitled to recover this amount under the
policies.

     5. Interior Carpentry and Miscellaneous Carpentry. The arbitrator
awarded damages in the amount of $4,035.00 for interior carpentry and
$8,683.43 for miscellaneous carpentry (Doc. 7-2, p. 4).   The defendants,
however, concede "that there was no evidence at trial that the items awarded
in the Interior Carpentry and Miscellaneous Carpentry categories of the
Arbitration Award resulted in property damage to other property" (Doc. 92,
p. 22).   Consequently, the claims for interior carpentry and miscellaneous
carpentry are not covered by the policies.

     6. Flybridge Windshield.   In the process of painting the vessel,
NOA removed the existing flybridge windshield and frame (Doc. 85, pp. 155-
56; see Doc. 86, p. 17).   A new windshield was ordered and NOA attempted

to install that glass into the original stainless-steel windshield frame (Doc. 86, pp. 17-19). However, the windshield cracked during the installation, causing NOA to order another windshield (id., pp. 19, 169). At this point, Mahaffey requested an upgrade to a smoked windshield (id., p. 169). NOA accommodated Mahaffey's request and absorbed the cost of the upgraded glass and its installation (id.). In order to install the upgraded windshield, NOA cut the stainless-steel frame and then welded it back together (Doc. 85, pp. 156-57; see Doc. 86, pp. 19-20; DE 3DD).

Merritt "found the securement point of the bridge windscreen either missing and or not bedded" during water testing, and it sealed the windshield as a "temporary repair until a windshield design could be agreed upon as the windscreen itself was not properly re-installed and pieces were not matching up" (JE 14, ¶9(bb)). Mahaffey informed Merritt that he would take care of a permanent fix to the windshield problem "at a later date" (id.).

In the arbitration award, the arbitrator stated (Doc. 7-2, p. 5):

> The flybridge windshield ... was a new installation by NOA; it leaked and required re-sealing at Merritt's shortly [after] leaving NOA. This attempted repair was unsuccessful, and replacement

> was recommended at Winter Harbor. While Winter
> Harbor's quote for replacement of the windshield
> appears excessive compared to NOA's charge for
> the same work, Respondent is awarded damages of
> \$5732.00 for the flybridge windshield.

The arbitrator's award for this item only related to the flybridge

windshield. The defendants' claim on this point, however, is for damage to

the flybridge windshield frame which NOA either broke or cut (Doc. 92, pp.

22-23). There is no indication that the arbitrator made any award for damage

to the frame. Accordingly, the defendants are not entitled to any recovery for

this item.[3]

C. The plaintiff in its post-trial submission has referred to

paragraph (vi) of the Endorsement's Exclusion, suggesting, I suppose, that it

defeats coverage of the defendants' claims (Doc. 91, p. 7). That provision

excludes coverage for claims (Doc. 1-1, p. 35; Doc. 1-2, p. 29):

> (vi) in respect of or arising from or in connection
> with condemnation or rejection of any part by
> reason of faulty design or faulty workmanship,

---

[3]The defendants point out that the plaintiff's expert, Helsen, stated that the break
in the flybridge window and frame is property damage (Doc. 92, p. 23). However, he also
said it was warranty work or poor workmanship (Doc. 85, p. 73). Thus, in all events, I
would discount Helsen's testimony on this point not only as irrelevant, but also as
contradictory.

-41-

> including the cost or expense of repairing,
> modifying or replacing any part (or for any loss or
> expense arising therefrom) by reason of faulty
> design or faulty workmanship....

The plaintiff has not advanced any argument in its post-trial submission supporting the application of Exclusion (vi). Consequently, any such contention is deemed abandoned.

D. The plaintiff makes the conclusory contention that there should be no award of prejudgment interest due to the defendants' "intransigence and over-reaching" (Doc. 91, p. 22). However, because there are no "peculiar circumstances" that would make it inequitable for the plaintiff to pay prejudgment interest, there is no reason why prejudgment interest should not be awarded here. See St. Paul Fire and Marine Insurance Co. v. Lago Canyon, Inc., 561 F.3d 1181, 1191-92 (11th Cir. 2009). Accordingly, prejudgment interest will be awarded at 6% per annum, the rate set forth by the state court, from January 13, 2013, as requested by the defendants (Doc. 92, p. 25).

III.

For the foregoing reasons, the court finds that, although Section (vii) is not applicable in this case, the arbitration award for the categories of paint ($25,000.00), electrical ($35,447.93), and flybridge hatch and seating ($11,856.00) fall within the coverage provided by Sections (i) and (iv) of the Endorsement's "Insuring Agreement." Therefore, judgment will be entered in favor of the defendants in the amount of $72,303.93, with prejudgment interest on that amount at a rate of 6% per annum, from January 13, 2013.

The Clerk shall enter judgment accordingly and CLOSE this case.

DONE and ORDERED at Tampa, Florida, this 22ⁿᵈ day of April, 2013.

                              _____
                                   THOMAS G. WILSON
                              UNITED STATES MAGISTRATE JUDGE